UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

     v.                                  Case No. 1:20-cr-00084-JL
                                      Opinion No. 2021 DNH 091P

Philip Wetmore

**MEMORANDUM ORDER**

In advance of his trial on one count of possessing a firearm as a prohibited person, see 18 U.S.C. §§ 922(g)(1) and 924(a)(2), defendant Philip Wetmore filed a motion to suppress evidence.[1]  The motion turns on whether the police conducted a constitutionally permissible detention and pat-search[2] of Wetmore, such that the resulting seizure of a firearm from Wetmore's person can stand.

After an evidentiary hearing, the court granted Wetmore's motion.[3]  At the court's invitation based on an issue that went un-briefed by counsel for both parties, the government has moved for reconsideration of the court's ruling,[4] and the parties engaged in supplemental briefing as part of the reconsideration motion.[5]  After careful consideration of this supplemental briefing, the motion for reconsideration is denied.  This order will explain that decision and set

---

[1] See Doc. No. 34.

[2] For purposes of this order, the court will use the terms "pat-search," "pat-frisk," "frisk," and "pat-down" interchangeably, as those terms generally share the same meaning in the law.

[3] See Oral Order and Endorsed Order of March 23, 2021.

[4] See Motion for Reconsideration (doc. no. 54).

[5] See Government's Memorandum of Law (doc. no. 58); Defendant's Memorandum of Law (doc. no. 63).

forth the bases for the court's decision to grant the Wetmore's suppression motion in greater

detail.  See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014), aff'd, 778

F.3d 247 (1st Cir. 2015) (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007) (noting a

district court's authority to later reduce its prior oral findings and rulings to writing).[6]

## I.    **Applicable legal standard**

Wetmore bears a threshold burden to show a Fourth Amendment violation in support of

his motion to suppress.  United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016); see also Rakas

v. Illinois, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden

of establishing that his own Fourth Amendment rights were violated by the challenged search or

seizure.").  This includes the "burden of establishing that he was seized" or searched without a

warrant.  United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016).  Once Wetmore shows that a

warrantless search or seizure occurred, the government bears the burden of showing that the

warrantless search or seizure was nevertheless lawful.  United States v. Winston, 444 F.3d 115,

123–24 (1st Cir. 2006); United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

As for the government's reconsideration motion, reconsideration of an order is "an

extraordinary remedy which should be used sparingly."  Palmer v. Champion Mtg., 465 F.3d 24,

30 (1st Cir. 2006) (quotation omitted).  Reconsideration is therefore "appropriate only in a

limited number of circumstances: if the moving party presents newly discovered evidence, if

there has been an intervening change in the law, or if the movant can demonstrate that the

original decision was based on a manifest error of law or was clearly unjust."  United States v.

Allen, 573 F.3d 42, 53 (1st Cir. 2009).  A party may not use a motion for reconsideration "to

---

[6] To the extent there is any inconsistency between the factual and legal findings in the court's
oral order and its written order, this order controls.

undo its own procedural failures" or "advance arguments that could and should have been presented earlier." Id.  And a motion for reconsideration is not "a mechanism to regurgitate old arguments previously considered and rejected." Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (internal quotation marks omitted).

## II.  **Background**

The court makes the following findings of fact based on the testimony and other evidence received at the suppression hearing.[7]  The government called Merrimack Police Officers Robert Maglio and Jordan Miranda as witnesses at the suppression hearing.  Wetmore called no witnesses.  The parties also entered six exhibits into evidence at the hearing.

At approximately 11:30 p.m. on February 15, 2020, Merrimack Police Officer Robert Maglio stopped at the Rapid Refill gas station on Peach Tree Lane in Merrimack to refuel his personal vehicle while on his way home from work.[8]  Officer Maglio had just worked the 3 p.m. to 11 p.m. patrol shift and was off-duty at the time.[9]  After he finished fueling his vehicle, Officer Maglio noticed that a blue Hyundai Elantra sedan had backed out of a parking spot by the storefront and blocked his vehicle from leaving the pump.[10]  Officer Maglio noticed that the Hyundai was occupied by a male driver wearing a beanie hat and over-ear headphones, as well as a female passenger.[11]

---

[7] See Final Exhibit Lists (doc. nos. 51 and 52).

[8] March 23, 2021, Transcript of Hearing on Motion to Suppress, 4:24-25; 11:15-18; 15:16-20; 47:19-22.

[9] T. 11:2-14.

[10] T. 11:24-12:5.

[11] T. 11:24-25; 16:14-20.

The Hyundai continued to block both Officer Maglio's vehicle and the way of travel in front of the store for 20 to 30 seconds.[12]  To get the Hyundai to move, Officer Maglio entered his vehicle, started the engine, and turned on the lights.[13]  The Hyundai continued to block Officer Maglio from leaving.[14]  With his headlights illuminating the interior of the Hyundai, Officer Maglio observed that the male driver's eyes were wide open.[15]  The driver appeared to be making furtive movements and repeatedly shaking or snapping his head around, alternating between looking at Officer Maglio's vehicle and looking at the female passenger.[16]  Officer Maglio understood that jerking movements, wide open eyes, and delayed or limited reactions to surroundings suggested possible impairment on drugs.[17]

After another 20 to 30 seconds, the vehicle began to move.[18]  The Hyundai approached the gas station exit, stopped and paused, and then advanced around the back of the building.[19] The vehicle pulled up to the intercom at the Burger King drive-thru, a business adjacent to the Rapid Refill station.[20]  The Burger King appeared closed at the time.[21]  The driver and passenger

---

[12] T. 16:8-11.

[13] T. 12:5-7.

[14] T. 12:9-17.

[15] T. 17:5-10.

[16] T. 12:9-13.

[17] T. 7:16-8:17; 12:15-18.

[18] T. 16:10-13.

[19] T. 12:19-24.

[20] T. 19:6-9; 19:14-15.

[21] T. 19:9-13.

door opened and closed.[22]  After about 30 seconds, the vehicle exited the lot without taking anything from the drive-thru.[23]

The Hyundai proceeded onto Continental Boulevard, traveling approximately 200 yards before turning left into the parking lot of a closed business.[24]  The vehicle parked in the lot for a minute or two before it pulled out and took a right toward Greeley Street.[25]  Officer Maglio reported his observations of the vehicle to the on-duty patrol supervisor to make the supervisor aware of the situation and send an on-duty patrol officer to investigate.[26]  The vehicle proceeded in an indirect, stop-and-start travel pattern,[27] though Officer Maglio did not observe any speeding, marked lane violations, or other motor vehicle violations.[28]  Officer Maglio followed the vehicle until it entered the Quality Inn parking lot on Daniel Webster Highway, relayed this last location to Officer Jordan Miranda (the responding on-duty patrol officer), and left the area.[29]

---

[22] T. 19:14-17.

[23] T. 19:18-21.

[24] T. 20:12-13; 20:22-24.

[25] T. 21:2-5; 23:3-9.

[26] T. 22:2-9.

[27] T. 22:22-23; 31:11-13.

[28] T. 33:6-10; 33:20-25.

[29] T. 23:3-11; T. 23:13-21; Ex. 2, at 4.  Officer Maglio relayed the Hyundai's location to Officer Miranda but did not describe his prior observations of the Hyundai or its driver to Officer Miranda during this call.  T. 24:2-8.

Officer Miranda began his shift around 11:00 p.m.[30]  During roll call, Officer Miranda heard Officer Maglio's call to the on-duty supervisor on speaker phone describing Officer Maglio's observations of the Hyundai and a potential male impaired driver and learned that the vehicle's last location was at the Quality Inn.[31]  Officer Miranda departed the station and arrived at the Quality Inn in his marked cruiser at approximately 11:40 p.m. and located the Hyundai, which was parked at a slight angle and facing into a parking space near the back of the parking lot.[32]  Officer Miranda backed his cruiser into a spot approximately 50 feet away where he could observe the vehicle with minimal obstruction.[33]  Officer Miranda cracked his window so that he could listen in on the Hyundai.[34]  The vehicle lights were on and a female – later identified as Falynne St John – occupied the driver's seat.[35]  At this time, Officer Miranda did not know if there was a second person in the car.[36]

---

[30] T. 47:15.

[31] T. 47:16-25; 48:1-2.

[32] T. 49:1-10; 51:22-24.  The Quality Inn is known to the Merrimack Police Department as an area where drug transactions often take place and officers conduct "directed patrols."  T. 46:17-23; 47:5-11.  Although Officer Miranda's interaction with the Hyundai took place at night, he described the Quality Inn parking lot as lit up by lamps and several lights in front of the entrance to the hotel.  T. 52:4-8.

[33] T. 49:16-23; 51:19-21; 52:12-22.

[34] T. 53:3-4.

[35] T. 48:8-9; 61:8-10.

[36] T. 54:6-9.

After about ten minutes, the Hyundai backed out of the spot and promptly pulled back into the spot.[37]   The vehicle did this one or two more times.[38]   Officer Miranda then observed St John stop the vehicle, exit the driver's seat, grab a bag from the backseat, and begin walking toward the entrance of the hotel.[39]   Through the vehicle's back window, he saw a male – later identified as the defendant, Philip Wetmore – move into the vacated driver's seat from a different location inside the vehicle.[40]   Wetmore backed the Hyundai out of the parking space and began driving toward the hotel exit, the same direction in which St John was walking.[41]

Officer Miranda momentarily lost sight of the vehicle but noticed it reappear when it reversed and began idling in the middle of the parking lot.[42]   St John walked back toward the vehicle, and Wetmore shifted into drive and attempted to maneuver around her.[43]   St John then stepped in front and blocked the path of the vehicle.[44]   Wetmore brought the vehicle to a stop.[45]   Concerned that the situation might potentially "turn into something more," Officer Miranda activated his cruiser lights and pulled up behind the Hyundai.[46]

---

[37] T. 53:5-8.

[38] T. 53:8-9; 53:14-20.

[39] T. 53:10-13.

[40] T. 55:19-56:1; 61:11-12.

[41] T. 54:17-21.

[42] T. 56:15-18; 57:18-25.

[43] T. 58:5-11.

[44] T. 58:9-14.

[45] T. 59:6-10.

[46] T. 59:11-20.

As Officer Miranda pulled up, Wetmore exited the Hyundai and appeared agitated.[47] Officer Miranda parked his cruiser behind the Hyundai between the pair.[48]  Officer Miranda observed Wetmore speaking in a louder than normal tone of voice to St John and gesturing with his hands as he spoke.[49]  Officer Miranda does not recall exactly what Wetmore said to St John, but Officer Miranda believes he used some swear words and specifically remembers Wetmore saying something like "this is your fault" to St John.[50]  Officer Miranda did not, however, hear Wetmore threaten St John.[51]  When Officer Miranda activated his emergency lights and approached the vehicle, St John seemed shocked or surprised.[52]

Wetmore continued to appear agitated and angry at St John but did not act aggressively toward the officer.[53]  Officer Miranda instructed Wetmore to move to the back of the car. Wetmore seemed confused by the officer's presence and asked him why he was being asked to move, but eventually complied.[54]  Officer Miranda described Wetmore's behavior toward him as "passive-aggressive."  He acknowledged that Wetmore was never non-compliant, but rather just

---

[47] T. 59:23-24.

[48] T. 59:19-60:2; 65:11-16.

[49] T. 60:13-15.

[50] T. 59:24-25; 60:15-17.

[51] T. 84:16-17.

[52] T. 61:4-7.

[53] T. 63:3-4.

[54] T. 86:1-2; 86:13-15.

slower to comply.[55]  After Officer Miranda began speaking to Wetmore, Wetmore mostly stopped talking to St John and turned his focus to Officer Miranda.[56]

Officer Miranda testified that Wetmore was fidgeting during their interaction, which the officer described as moving his hands up and down or gesturing with his hands like he was talking with his hands.[57]  At that point, Officer Miranda's focus was no longer on a potential impaired driver situation, but preventing the situation between Wetmore and St John from escalating.[58]  Officer Miranda testified that based on his training and experience and observations of the subject Hyundai and its occupants, he believed there was a "potential domestic in progress," or something that "could be a potential disturbance," but not an actual "domestic disturbance at the time."[59]

Officer Miranda then instructed Wetmore to face and put his hands on the Hyundai and told him that he was "going to search [him] for weapons."[60]  The precise sequence of events that followed is less clear.

Wetmore placed both hands on the vehicle, but then pulled one of his hands down, which prompted Officer Miranda to ask Wetmore "a couple" of times to return his hand to the

---

[55] T. 65:18-19; 68:1-3; 85:18-22.

[56] T. 90:10-15.

[57] T. 60:14; 65:23; 66:20-25.

[58] T. 75:17-22; see also T. 64:12-15; 87:13-15.

[59] T. 64:1-2; 69:3-9.

[60] T. 72:11-13; 93:6-12.  Officer Miranda testified that in "typical" domestic dispute situations, his practice is to always check for weapons, either through a "Terry pat" or by asking the parties if they have weapons.  T. 65:24-25; 68:17-21.

vehicle.[61]  Officer Miranda also testified that Wetmore gestured toward his jacket multiple times, but could not remember whether it was before or after he announced to Wetmore that he was going to search him for weapons.[62]  And Wetmore's police report suggested that Wetmore "played with" his jacket <u>after</u> the officer first announced the search.[63]  It is also unclear whether Officer Miranda was conflating Wetmore's hand gestures or fidgeting with reaching for, or playing with, his jacket.

Officer Miranda placed his hands on Wetmore to begin the pat-down and asked him if he had any weapons on him, as that is "the first thing [Officer Miranda] ask[s] when [he] starts to pat" someone down.[64]  Wetmore responded that he had a knife on him.[65]  Officer Miranda started patting Wetmore down and asked him where the knife was.[66]  Wetmore did not answer and Officer Miranda continued patting him down and felt a bulge in Wetmore's chest region.[67]  Officer Miranda discovered a firearm and removed it from a shoulder holster underneath

---

[61] T. 72:15-20.

[62] T. 67:1-3; 93:13-18; 94:2-3.

[63] The report was not formally admitted into evidence as an actual exhibit during the suppression hearing, but the parties referred to it during witness questioning and oral argument.  The court also expressly relied on it, to make a factual finding at the hearing, without objection from either party.  Officer Miranda's report notes, in part, that he "advised [Wetmore] [he] was going to search [Wetmore] for weapons before [Officer Miranda] continued.  [Wetmore] argued for a brief moment and continued to play with his jacket."

[64] T. 72:1-5; 94:11-14.

[65] T. 72:1-5; <u>see</u> <u>also</u> T. 98:10-11 ("Q. So, he told you he had a knife after you had hands on him? A. Correct.").

[66] T. 73:8-9.

[67] T. 73:9-11.

Wetmore's sweatshirt.[68]  Officer Miranda asked why Wetmore had not told him about the weapon and asked if it was because he was a convicted felon.[69]  Wetmore informed Officer Miranda that he was a felon.[70]

Officer Miranda then detained Wetmore and continued the search of Wetmore's person before placing him into the police cruiser.[71]  This subsequent search revealed two plastic bags containing a substance appearing to be methamphetamine and one bag containing a brown-white substance appearing to be heroin/fentanyl.[72]  Wetmore was arrested and indicted by a grand jury for one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

## III.   Analysis

Wetmore argues that Officer Miranda's detention and pat-down were unconstitutional, and the evidentiary fruits of these encounters should be suppressed.  The court ruled at the hearing, and reiterates in this order, that the initial detention was constitutionally permissible under the community caretaking doctrine.  The pat-down, however, violated Wetmore's Fourth Amendment rights, as Officer Miranda was not justified in believing that Wetmore was armed and dangerous to the officer or others at the time Officer Miranda initiated the pat-down.  The

---

[68] T. 73:15-17; 74:1-8.

[69] T. 73:11-14.

[70] Id.

[71] T. 74:2-5; 74:9-11.

[72] T. 74:12-18.

government moves to reconsider the court's latter ruling and the court denies that motion for the reasons detailed below.

### A.      The initial stop and detention

The community caretaking doctrine recognizes that law enforcement officers "provide an infinite variety of services to preserve and protect community safety," in addition to being "enforcer[s] of the criminal law."  United States v. Rodriguez-Morales, 929 F.2d 780, 784-85 (1st Cir. 1991).  Under the doctrine, "police action can be constitutional notwithstanding the fact that it constitutes a seizure."  Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007) (emphasis in original).  Recognized community caretaking functions include combating actual hazards, preventing potential hazards from materializing, alleviating dangerous roadside conditions, and responding to emergencies requiring the officer's attention.  See United States v. Gemma, 818 F.3d 23, 31 (1st Cir. 2016); Lockhart-Bembery, 498 F.3d at 71-72; United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014).  An officer, however, must have a "noninvestigatory reason" for engaging in community caretaking activities.  Rodriguez-Morales, 929 F.2d at 787.

The doctrine "gives officers a great deal of flexibility in how they carry out their community caretaking function" and the "ultimate inquiry is whether, under the circumstances, the officer acted 'within the realm of reason,'" taking into account "the various facts of the case at hand."  Lockhart-Bembery, 498 F.3d at 75 (quoting Rodriguez-Morales, 929 F.2d at 786).

Although Officer Miranda likely seized or detained Wetmore when he pulled his cruiser behind the Hyundai, the stop and brief detention of Wetmore and St John were constitutionally permissible under the community caretaking doctrine.  Officer Miranda acted well within the realm of reason to intervene after he observed St John block the egress of a moving vehicle by

stepping in front of the Hyundai.  Whether or not it was a domestic dispute (and this court finds

that it was not, see infra, Section III, B. 1), stepping in front of a moving vehicle that was also

trying to maneuver around the person is a potential hazard that warranted police intervention.

See Gemma, 818 F.3d at 31; see also Lockhart-Bembery, 498 F.3d at 71-72, 75-76 (holding that

the temporary seizure of a motorist for the purpose of alleviating dangerous roadside conditions

could be a reasonable exercise of the community caretaking function).

      The need for the caretaking activity also outweighed "the affected individuals' interest in

freedom from government intrusions," as the encounter and near-accident between Wetmore and

St John occurred out in the open in a parking lot and business accessible to the public.  Castagna

v. Jean, 955 F.3d 211, 221 (1st Cir. 2020) (alteration omitted).

      Lastly, Officer Miranda's decision to intervene was not "a mere subterfuge for

investigation" of a crime, as he credibly testified that by the time he detained Wetmore, any

concerns about a potential impaired driver had left his mind.  Rodriguez-Morales, 929 F.2d at

787.  Officer Miranda therefore had a non-investigatory reason for detaining Wetmore, and the

stop and initial detention of Wetmore and St John were constitutionally permissible under the

community caretaking doctrine.

      **B.**    **The pat-search**

      Wetmore also challenges the legality of Officer Miranda's warrantless pat-search, which

is a separate Fourth Amendment event from the detention.  It is "insufficient" that the detention

itself was valid; "there must be a separate analysis of whether the standard for pat-frisks has been

met."  United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005); see also Arizona v. Johnson, 555

U.S. 323, 326-27 (2009).  "[T]o proceed from a stop to a frisk, the police officer must reasonably

suspect that the person stopped is armed and dangerous."  Johnson, 555 U.S. at 326-27.  The pat-

search cannot be justified under the community caretaking doctrine because by the time Officer Miranda decided to search Wetmore for weapons, the potential hazard from the near vehicle-pedestrian collision had subsided.  See United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005) (noting that a community caretaking detention "must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification. Once the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has a reasonable suspicion of criminal conduct" (citations omitted)).  And the government offers no argument that the community caretaking basis of the stop provided a constitutional basis for the pat-down.  The pat-down therefore must be supported by some other exception to the warrant requirement.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate," are usually deemed "per se unreasonable" for purposes of the Fourth Amendment – "subject only to a few specifically established and well delineated exceptions."  Minnesota v. Dickerson, 508 U.S. 366, 372 (1993).  One well-established exception is derived from Terry v. Ohio, 392 U.S. 1 (1968) and permits a police officer to conduct a warrantless, limited pat-down search if the officer has a reasonable and articulable suspicion that the person is "armed and presently dangerous to the officer or to others."  Terry, 392 U.S. at 24.

In its motion for reconsideration, the government argues that Officer Miranda's observations show that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Doc. no. 58, at 6 (quoting Terry, 392 U.S. at 27).  This quote from Terry suggests that only suspicions of safety risks are required to

justify a frisk, but Terry requires more.  While the government must prove some degree of safety

risk, it must also show that the officer had reasonable and articulable suspicion "to believe that

he [was] dealing with an armed and dangerous individual."  Terry, 392 U.S. at 27; see also

Cardona-Vicente, 817 F.3d at 827 (in judging the lawfulness of a Terry frisk, the "key is

whether, under the circumstances, 'the officer is justified in believing that the person is armed

and dangerous to the officer or others.'") (emphasis added) (quoting United States v. Romain,

393 F.3d 63, 71 (1st Cir. 2004)).

       "To assess the legality of a protective frisk, a court looks at the totality of the

circumstances to see whether the officer had a particularized, objective basis for his or her

suspicion."  Id.  "Evaluating whether an officer's suspicions are (or are not) reasonable is a fact-

sensitive task" dependent on the surrounding circumstances of each police encounter.  United

States v. Chhien, 266 F.3d 1, 8 (1st Cir. 2001).  Thus, "[d]eference is due to the experienced

perceptions of the officers, . . . but not blind deference; these perceptions must be reasonable

under an objective standard," and more than an officer's mere hunch is required.  United States

v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (quoting United States v. Woodrum, 202

F.3d 1, 7 (1st Cir. 2000)); see also Terry, 392 U.S. at 27 (noting that "due weight must be given,

not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific

reasonable inferences which he is entitled to draw from the facts in light of his experience").

       "[R]easonableness of official suspicion [for purposes of a pat-search] must be measured

by what the officers knew before they conducted their search."  Florida v. J.L., 529 U.S. 266,

271 (2000).  Here, Officer Miranda testified that his observations leading up to the

announcement of the pat-search were what he used to justify the search. [73]  He also did not cite

---

[73] T. 71:21-24.

Wetmore's comment about the knife as a basis to conduct the frisk because Wetmore stated he had a knife after Officer Miranda had already laid hands on him.  The court will accordingly focus on the pre-announcement observations.

The government argues that several facts provided the requisite suspicion: (i) the possibility that Wetmore and St John's interaction could become a domestic dispute; (ii) Wetmore's hand movements or gestures; and (iii) Wetmore's alleged non-compliance with Officer Miranda's directives.  The court addresses each of these categories of observations and assesses whether their cumulative effect would justify a reasonable officer in believing that Wetmore was armed and dangerous.

### 1.    Possible domestic dispute or assault

Officer Miranda believed that Wetmore's interaction with St John could become a domestic dispute or assault situation if he did not intervene.  In his experience, domestic disputes can become violent.  But he also testified that he had no evidence that any type of assault or domestic violence had already occurred or was in the process of occurring when he intervened. While true that domestic disputes have the potential for violence, to support a pat-search, the "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the search.  Terry, 392 U.S. at 21.

Officer Miranda testified that in "typical domestic [disputes]" one of the first things his department does after separating the parties is "a Terry pat" to "check for weapons."[74] Department-wide practices or generalized experience in certain types of cases, however, are not enough to justify a frisk, nor is a "mere 'inchoate and unparticularized suspicion or hunch'" that

---

[74] T. 65:24-25; 68:17-21.

a person is armed and dangerous.  Maryland v. Buie, 494 U.S. 325, 332 (1990) (quoting Terry, 392 U.S. at 27) (some internal quotation marks omitted).

Domestic disputes, even if one had occurred here, also do not per se justify pat-downs of those suspected to be involved or aggressors.  They are not the type of incidents that, by their nature alone, are likely to involve the use of weapons.  Thomas v. Dillard, 818 F.3d 864, 878 (9th Cir. 2016) ("[D]omestic violence is not a crime such as bank robbery or trafficking in large quantities of drugs that is, as a general matter, likely to involve the use of weapons. Thus, officers may not rely solely on the domestic violence nature of a call to establish reasonable suspicion for a frisk.").  While "[s]ome domestic violence calls may pose serious threats to officers, such as those requiring an officer to enter a suspect's home and intervene in the middle of a heated fight or vicious attack," id. at 879, this was not one of those situations.  Cf. United States v. Mouscardy, 722 F.3d 68, 75 (1st Cir. 2013) (finding suspicion to support a frisk where "the officers were responding to a report of a man beating a woman in the street" and had "reasonable suspicion that a crime of violence has occurred") (quoting United States v. Scott, 270 F.3d 30, 41 (1st Cir.2001) (emphasis added)).

This was not a call for a domestic dispute, and there were no witness accounts or 911 calls about Wetmore harming or threatening to harm St John prior to the officer's arrival. Officer Miranda responded to the scene after reports of an impaired male driver and did not immediately intervene.  Once on the scene, the officer did not observe a physical fight or attack in progress.  Nor did he hear Wetmore and St John arguing or fighting while they were parked in the Quality Inn parking lot.[75]  In fact, at the time Officer Miranda observed the vehicle back in and out of the parking spot multiple times and then observed St John leave the vehicle from the

_____

[75] T. 77:8-12; 19-20.

driver's seat, he did not know there was another person inside the car.[76]  It was therefore not reasonable to infer at that time that the car backing in and out suggested there were two people inside arguing.

Officer Miranda also admitted that Wetmore was not trying to hit St John with the vehicle.  It appears Wetmore was trying to leave the parking lot and St John was blocking his egress to prevent him from leaving by stepping in front of the car.  This is not indicative of an intent to assault one's domestic companion.

Once Officer Miranda intervened with his cruiser, he observed Wetmore yelling and swearing at St John, but does not recall anything Wetmore said except words to the effect of "this is your fault."  Officer Miranda did not hear Wetmore threaten St John and did not observe him physically assaulting or attempting to assault her.  While the evidence suggests that Wetmore was upset with St John, it does not show that he posed a safety threat to her.[77]  And St John was not crying, asking for help, or otherwise expressing fear of Wetmore, which suggests, at least ostensibly, that she did not believe her safety was at risk.  Moreover, Officer Miranda mitigated any threat by positioning his cruiser between them.  At that point, as Officer Miranda testified, Wetmore stopped yelling at St John and began to focus his attention on him.[78] Wetmore did not attempt to flee the scene and did not act aggressively toward Officer Miranda.

Of course, it goes without saying that not every apparently contentious situation between adults of the opposite sex qualifies as a domestic violence incident or domestic dispute.  The

---

[76] T. 54:6-9.

[77] If anything, it shows that Wetmore was blaming St John for causing them to attract police attention.

[78] According to Officer Miranda, this physical distance often works in preventing the situation from escalating further into physical violence.  T. 42:20-22.

court is disinclined to view this as a domestic dispute, either potential or actual.  Beyond Officer

Miranda's description of his general experience in domestic disputes, there are insufficient facts

from which the court can conclude that this was a potential domestic dispute or assault, let alone

a severe enough domestic situation to warrant police intervention through a frisk of the male

subject.  See Thomas, 818 F.3d at 883 ("no reasonable officer could assume all persons involved

in a simple domestic battery are, as a categorical matter, likely to be armed and dangerous").

### 2.      Wetmore's hand gestures or fidgeting

The government argues that Wetmore's "dramatic" hand movements suggest this was an

"escalating domestic situation" that reasonably signaled to the officer that Wetmore was armed

and dangerous.[79]  And Officer Miranda testified that Wetmore was fidgeting or gesturing with

his hands while speaking with him.  But other than concluding that these were "dangerous

circumstances," neither the government nor Officer Miranda explained how these hand gestures

might have suggested that Wetmore was armed.  General signs of nervousness or other

instinctive human movements do not normally alone support reasonable suspicion that a subject

is armed and dangerous.  See Thomas, 818 F.3d at 884 ("By fidgety, [Officer] Dillard meant

only that Thomas and Husky exhibited normal hand movements, noting that it is not natural for

people to stand in a perfectly still, statuesque form. Thomas and Husky, in other words, behaved

normally. Such behavior does not give rise to reasonable suspicion to believe a suspect is armed

and dangerous.").  Nor, as in traffic stop situation, is it "reasonable to infer that a driver (here, a

person standing next to a car) is armed and dangerous because the officers believe that he

appears nervous and reaches toward the car's console (here, other fidgeting or hand movements)

---

[79] Doc. no. 58, at 7.

when approached by police, even in a high-crime neighborhood."  McKoy, 428 F.3d at 41

(alterations added).

**Jacket gestures**.  The government next argues that Wetmore's alleged gestures toward

his jacket created reasonable suspicion that he was armed.  The court is not persuaded for the

following reasons.  First, Officer Miranda never conclusively testified that Wetmore's alleged

gestures toward his jacket signaled to him that Wetmore might have been reaching for a weapon.

When first asked by the Assistant United States Attorney about Wetmore's fidgeting or hand

gestures, Officer Miranda responded that they "show[ed] a sign of nervousness or just kind of

[Wetmore] thinking what his next move [was] going to be or things like that."[80]   When the court

later asked Officer Miranda whether Wetmore's fidgeting or touching the jacket made him

"think he was either going for or trying to hide a weapon," Officer Miranda candidly testified

that "[a]t that point [he] was completely unsure."  When the court followed up by simply asking

if this meant Officer Miranda was "curious about it, wondering, suspicious," the officer

responded that he "was curious, yeah.  It was a suspicion of mine if he had a weapon on his

person or not."[81]   This ambiguous (but honest, in the court's view) answer was far from an

articulation of reasonable suspicion that Wetmore was armed and dangerous.  The court then

gave Officer Miranda a chance to further elaborate on this point, but he declined.

Thus, when asked on direct with ample opportunity for follow-up what the alleged

gestures to the jacket signaled to him, Officer Miranda did not mention a weapon or general

dangerousness, and only parroted an alleged "curiosity" or "suspicion" of a weapon when

prompted by the court.  The court therefore cannot conclude that this evidence regarding the

---

[80] T. 66:20-22.

[81] T. 99:9-18.

alleged jacket gestures would have signaled to a reasonable officer that Wetmore may have been reaching for or trying to conceal a weapon.

Second, the alleged gesturing toward the jacket was also inconclusive as to Wetmore's possession of a weapon or dangerousness because Officer Miranda may have confused or conflated it with Wetmore's other hand gestures. Officer Miranda initially grouped all of these gestures together as "fidgeting" behavior, and neither his later testimony nor his report were clear on this matter, as he used the verb "play with" in his report, as opposed to "reach" in his testimony. Officer Miranda's testimony was further muddled by the fact that he appeared to contradict himself at times[82] and was often responding to leading questions by the Assistant United States Attorney.

Third, even if Wetmore's gestures toward his jacket could have suggested that he was armed and dangerous, the gestures occurred after Officer Miranda announced, and thus had already begun, the pat-down. Officer Miranda credibly testified in response to a direct question from the court that he could not remember whether Wetmore reached for his jacket before or after he announced the pat-down. In the absence of clearer testimony, the court referred to Officer Miranda's written incident report, which suggested that Wetmore "played" with his jacket after the announcement.[83] This post-announcement observation therefore cannot factor

---

[82] While Officer Miranda's testimony was inconsistent at times, the court is not suggesting that he was untruthful or evasive. Officer Miranda was a credible witness. But his attention – in engaging two citizens to ensure public safety and prevent a situation from escalating into a scenario potentially involving domestic violence from his subjective perspective – was not focused on the granular and compartmentalized distinctions being drawn by counsel and the court's many questions.

[83] T. 100:9-15. The report ambiguously notes that Wetmore "continued to play with his jacket," but it is not clear what Officer Miranda meant by "continued to" or whether this meant Wetmore was playing with his jacket prior to the announcement of the pat-down. The court simply cannot

into the reasonable suspicion analysis, which "must be measured by what the officers knew before they conducted their search." J.L., 529 U.S. at 271 (emphasis added).[84]

None of the hand gestures – even in the context of a somewhat animated interaction between Wetmore and St John – created reasonable suspicion that Wetmore was armed and dangerous.

**The point at which the pat-down was initiated**.  In its colloquy with the parties at the suppression hearing and in a subsequent conference, the court was focused on the issue of the point in time when the pat-down began (which, as it turns out, is not a particularly consequential issue in this suppression analysis).  And it allowed the parties to submit supplemental briefing on this issue.  But because, as explained above, Wetmore's alleged gestures toward his jacket were inconclusive as to whether he was carrying a weapon or dangerous, and those gestures are the only officer's observation that came after the announcement of the pat-down, but before Officer Miranda first physically touched Wetmore to begin patting, this motion ultimately does not turn on the point in time when the pat-down began.

---

conclude on this record that Officer Miranda observed Wetmore reaching for his jacket before he announced the pat-down.

[84] Relatedly, while the government did not make this argument in its initial briefing on the motion to suppress or post-hearing supplemental briefing, Wetmore's moving his hand off the top of the vehicle (which happened after Officer Miranda announced the search and ordered Wetmore into the search position) also does not move the needle on reasonable suspicion because this is the type of reactive, instinctive movement that "differ[s] from unprovoked, sudden movements, and do[es] not give rise to reasonable suspicion."  Thomas, 818 F.3d at 885. The court is also not fully convinced that Wetmore moved his hand off the vehicle as Officer Miranda testified because Officer Miranda did not note this fact in his report, which was written shortly after the incident when his memory was fresher.  T. 87:2-10.

The court nevertheless finds, for the following reasons, that Officer Miranda's announcement to Wetmore that he was going to search him for weapons and corresponding command to face and put his hands on the vehicle marked the point at which reasonable suspicion that Wetmore was armed and dangerous was required.  This ruling applies to the specific facts and circumstances of this case and is not intended as a bright-line pronouncement applicable in the court's Terry frisk cases.  See Ohio v. Robinette, 519 U.S. 33, 39 (1996) (noting that the court has typically "eschewed bright-line rules [in the Fourth Amendment context], instead emphasizing the fact-specific nature of the reasonableness inquiry"); Michigan v. Chesternut, 486 U.S. 567, 574 (1988) (noting that Fourth Amendment analysis must be "flexible enough to be applied to the whole range of police conduct in an equally broad range of settings").

There is little authority – and the court's research revealed no authority from the First Circuit Court of Appeals – expressly delineating when a Terry pat-search begins.  There are, however, some clear guideposts to this analysis.  An officer has not initiated a pat-search when he has mentally formed the intent to do so, but has not verbalized that intent to the suspect or laid hands on the suspect.  See United States v. Tinnie, 629 F.3d 749, 752-53 (7th Cir. 2011) (finding that a pat-down search had not begun simply because the officer had formed the mental intention of conducting a pat-down search).  By contrast, a pat-search has certainly started by the time the officer physically puts his hands on the individual to be frisked.  The question here is whether something in between those two points – like Officer Miranda's announcement of the search and a command for Wetmore to assume the position of the search – can mark the beginning of the search.  The court finds, under the circumstances present here, that it can.

The authority that has addressed this question is split.  Compare, United States v. Weaver, 975 F.3d 94, 101 (2d Cir. 2020) ("It is clear that Officer Tom had effectively initiated a search of Weaver when he instructed him to place his hands on the trunk with legs spread apart . . . because there is no other reason in our view to ask Weaver to assume this position"); Doornbos v. City of Chicago, 868 F.3d 572, 581-82 (7th Cir. 2017) (officer frisked subject when he reached out his arm to grab the subject), and United States v. Sykes, No. 17-CR-2009-LRR, 2017 WL 1455968, at *7 (N.D. Iowa Apr. 21, 2017), report and recommendation adopted, No. 17-CR-2009-LRR, 2017 WL 2514953 (N.D. Iowa June 6, 2017), aff'd, 914 F.3d 615 (8th Cir. 2019) (holding that the pat-search began when the "officer told the defendant he was going to conduct a pat-down and was physically directing defendant's movement against the wall for the purpose of conducting the pat-down"), with United States v. Gurule, 935 F.3d 878, 885–86 (10th Cir. 2019), as revised (Oct. 10, 2019), cert. denied, 140 S. Ct. 1285 (2020) (finding that a search "did not commence until the officer physically manipulated Gurule's right-front pocket"), Commonwealth v. Clemens, 66 A.3d 373, 382 (Pa. Supr. Ct. 2013) (rejecting defendant's assumption "that the frisk commenced at the moment Officer Centeno ordered Appellant to stand up and turn around to prepare for the frisk") and State v. Smith, 134 N.J. 599, 620 (1994) (focusing on the point of physical contact between officer and suspect "to determine whether [the officer] objectively realized that his safety and that of his partner were in danger").[85]

---

[85] The government also cites Tinnie and United States v. Snow, 656 F.3d 498, 500 n.1 (7th Cir. 2011) as cases supporting the proposition that a Terry frisk only begins when the officer makes physical contact with the suspect.  See Doc. no. 58, at 11.  Neither decision, however, adopted this stance as a categorical rule.  In Tinnie, the panel majority assumed, without discussion or analysis, that the frisk began when the officer first made physical contact with the suspect.  629 F.3d at 753.  And in Snow, the court assumed that the "process of the frisk commenced when [the officer] ordered [the suspect] to step out of the truck and to place his hands on the vehicle so that he could be patted down," and that reasonable suspicion was required to justify this order,

In the absence of a majority rule, the government argues that language from Terry describing the term frisk suggests that a frisk only begins when the officer touches the suspect. See Gov't.'s Memo. of Law (doc. no. 58) (quoting Terry, 392 U.S. at 17-19, 24-25) (describing a "frisk" as "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons" and a "limited search of the outer clothing for weapons"). But Terry did not answer the question of when a pat-search begins.[86] Thus, Terry's language describing the physical act of patting someone down does not answer the questions of whether a frisk may begin at the announcement of the search and order to assume the search position, or whether and to what extent observations occurring after those events may constitute grounds for a pat-down.

The government's reliance on Terry's frisk definition also overlooks the fact that a frisk is a search, and searches in general can take on many forms, including verbal commands with no physical touching. See, e.g., Weaver, 975 F.3d at 101 (holding that "a search, like a seizure, may begin before there is any physical contact"); Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364 (2009) (school officials' verbal orders to remove outside clothing, without physical contact of student, treated as a "search"); United States v. Reyes, 349 F.3d 219, 225 (5th Cir. 2003) (border officer's verbal order to empty pockets and lift shirt treated as a Terry weapons search).

Frisks are also not limited to traditional pat-downs. See Thomas, 818 F.3d at 875 (finding that officer's order to suspect to submit to Terry frisk – while pointing a Taser at suspect

_____

"regardless of whether and when [the officer] touched [the suspect's] person." 656 F.3d at 500 n. 1. Snow is therefore unhelpful to the government here and Tinnie is marginally relevant.

[86] At the risk of stating the obvious, there was no reason for the Terry court to address this question as it was not before the court.

– was a search); Doornbos, 868 F.3d at 581 ("As with 'seizures,' an officer can initiate a frisk before physically touching a person"); United States v. Dalpiaz, 494 F.2d 374, 377 (6th Cir. 1974) (declining to read Terry as limited to "pat-down" situations and ruling that airport security officer's verbal order to empty pockets was a "limited search" under Terry); United States v. Moore, No. 2:08-CR-16, 2008 WL 4981704, at *2 (E.D. Tenn. Nov. 19, 2008), aff'd, 390 F. App'x 503 (6th Cir. 2010) (finding that an officer's command to the defendant "to place his hands on the hood of the patrol car and to spread his legs" was an "attempted search of the defendant's person" under Terry); Powell v. United States, 649 A.2d 1082, 1087 (D.C. 1994) (per curiam) (opinion of Sullivan, J.) (ruling that frisk begins when decision to frisk is made and officer orders occupant to "assume the search position").  Thus, while a frisk as defined in Terry involves touching, frisks – like other searches – are not limited to situations involving physical contact with subjects.

The Terry court justified a warrantless frisk because a police officer has an "immediate interest . . . in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  Terry, 392 U.S. at 23. This purpose is served not just by patting someone down, but also by the other non-physical examples of protective searches and frisks highlighted above.  In this case, those steps to assure officer safety included announcing the frisk to Wetmore and ordering Wetmore to face and place his hands on the vehicle so Officer Miranda could pat him down.  Officer Miranda took these steps solely for the purpose of conducting the pat-search and touched Wetmore soon after his announcement and order, which suggests that they "began the process" of the frisk.  Snow, 656 F.3d at 500 n. 1; see also Weaver, 975 F.3d at 102 ("Officer Tom's actions in ordering Weaver to step out of the car and assume a position with his hands on the trunk and feet spread apart were

undertaken solely in order to frisk Weaver.  That is why Officer Tom's order marks the point at which reasonable suspicion that Weaver was armed and dangerous was required.").

The other cases that the government relies on to advance its "physical contact" frisk rule are distinguishable because officers did not announce the frisk or order the suspect into the search position, or both, before physically patting the suspect down, as Officer Miranda did here. See Tinnie, 629 F.3d at 752-53 (order to exit car); Gurule, 935 F.3d at 885 (order to stand after initial command to sit on curb); Clemens, 66 A.3d at 382 (no announcement of frisk); Smith, 134 N.J. at 605 (longer delay between announcement of intent to frisk and physical touching, and no order to assume search position); see also United States v. Raymond, 152 F.3d 309 (4th Cir. 1998) (order to exit car to allow officers to conduct a consensual search of car).  These decisions therefore do not persuade the court to adopt the government's proposed rule.

Lastly, the government argues that a contrary ruling would "unnecessarily place[] officers in potentially perilous positions," because after a premature announcement of a frisk, additional facts may come to light that put the officer in danger.[87]  This argument would have some merit if the court was announcing a bright line rule applicable in all future Terry frisk situations.  But it is not.  Indeed, situations may arise where an officer announces a pat-search, but significant time passes before he touches the suspect.  Under those circumstances, the temporal gap would minimize the intrusiveness of the announcement, and a reasonable person in the suspect's position would not believe he was being searched at the time of the announcement.  See Weaver, 975 F.3d at 101 (noting that "any reasonable person could only have interpreted [an officer's orders out of a car and to assume 'spread eagle' search position] to mean that the search had begun").  Moreover, the risk of additional, safety-implicating facts coming to light after the

_____

[87] Doc. no. 58, at 12.

frisk's announcement would be more likely to pose a problem under circumstances involving a lengthy delay between when an officer announces a frisk and actually touches a suspect. That did not happen here. Officer Miranda testified that all of this transpired very quickly.[88]

Further, nothing in this ruling suggests that visual or audible observations and perceptions by the on-scene officers occurring after the announcement of an intention to search but before physical contact is made are per se excluded from the danger analysis. Clearly, if Officer Miranda, after announcing his intention to search, had noticed a weapon-like bulge protruding under Wetmore's clothing before making physical contact, he could have considered that before proceeding. But again, that did not happen here. Instead, Officer Miranda did not observe anything on Wetmore's person that suggested he was carrying a weapon, and Officer Miranda only learned that Wetmore may have been carrying a weapon after he made physical contact.

In sum, in this case, Officer Miranda's announcement of the pat-down and order to Wetmore to assume the search position were logically and practically inseparable from the pat-down itself. Wetmore was obligated to comply and Officer Miranda almost immediately laid hands on him to begin patting after these initial steps. The announcement of the pat-search and order to assume the search position therefore marked the beginning the search at issue. [89]

---

[88] T. 93:18; 88:20-25; 89:1-3.

[89] Alternatively, the court finds and rules that Officer Miranda's order to Wetmore to put his hands on the vehicle so he could search him for weapons could be considered a separate seizure that needed to be supported by reasonable suspicion that criminal activity was afoot. See Clemens, 66 A.3d at 379 ("We agree with Appellant that—when Officer Centeno told Appellant to stand up and turn around so that the officer could pat Appellant down for officer safety— Officer Centeno subjected Appellant to an investigatory detention.") (citing Commonwealth v. Hicks, 434 Pa. 153 (1969) ("Terry makes it clear that if a police officer accosts a person on the street and restrains him of his freedom to walk away, [the officer] has 'seized' that person"); Reid v. Georgia, 448 U.S. 438, 440 (1980) ("while the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any

### 3.     Delayed compliance with orders

The government also argues that Wetmore resisted the officer's orders to separate from St John and that this is indicative of dangerousness.  Officer Miranda characterized Wetmore's behavior as "passive aggressive," but conceded that Wetmore was not aggressive towards him. A better description, based on Officer Miranda's testimony, is that Wetmore's behavior was mildly uncooperative and dilatory.  It appears Wetmore was surprised by the officer's presence and questioned why the officer was there and engaging him to begin with.  This questioning and initial reluctance to engage with Officer Miranda or comply with his requests does not suggest that Wetmore was armed or dangerous.  See, e.g., Florida v. Bostick, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); United States v. Santos, 403 F.3d 1120, 1125-26 (10th Cir. 2005) ("A refusal to consent to a search cannot itself form the basis for reasonable suspicion."); Terry, 392 U.S. at 32 (Harlan, J., concurring) (noting that "every citizen" has "the liberty . . . to address questions to other persons").[90]

---

curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.") (citations omitted). Here, that suspicion was missing.  Officer Miranda testified that he had no indication that an assault had already occurred or was in progress at the time he ordered Wetmore into the search position.  There is also no evidence of other criminal activity at that time, and Officer Miranda further testified that by the time he intervened to engage Wetmore and St John, any suspicions or concerns about an impaired driver had left his mind.  Indeed, Officer Miranda initially intervened as part of his community caretaking function, not to investigate other crimes.  Once Officer Miranda engaged the situation between Wetmore and St John by making contact with them, the caretaking function was complete, and the police encounter should have ended.  Because the subsequent seizure was unsupported by reasonable suspicion, the ensuing pat-down should never have occurred and was therefore unlawful.

[90] See also Powell, 649 A.2d at 1087 ("I fail to see how a request by a citizen of the District of Columbia to a uniformed police officer, and his two fellow officers, inquiring about the reason for being stopped, can be termed uncooperative and provide a basis for frisking that citizen,

Wetmore eventually complied with the officer's orders, albeit after a short delay.  Again, he did not flee and did not resist in the traditional sense of resisting arrest or detention, and was not charged with doing so.  Nor did Wetmore's behavior toward the officer become more aggressive or hostile after his initial delay in compliance.  Cf. United States v. Orth, 873 F.3d 349, 357 (1st Cir. 2017) (subject's initial non-compliance, followed by argumentative and hostile behavior toward officer, followed by additional non-compliance – along with other factors – sufficient to show reasonable suspicion); United States v. Brake, 666 F.3d 800, 802 (1st Cir. 2011) (subjects' ignoring police commands and walking away from possible scene of fight and armed threat provided reasonable suspicion).  This behavior, even when combined with the other observations discussed above, would not signal to a reasonably prudent officer that Wetmore may have been armed and dangerous.

### 4.    Summary

The only objectively reasonable signal that Wetmore was armed was his statement to Officer Miranda that he had a knife.  This comment – which came in response to Officer Miranda's question of whether Wetmore had any weapons on him – occurred after Officer Miranda had already placed his hands on Wetmore to begin the pat-down, and therefore cannot be considered as part of the reasonable suspicion analysis.  By that time, the pat-down had clearly already begun.[91]  Indeed, Officer Miranda testified that this is the first thing he "ask[s]

---

especially when the driver's license and registration had already been produced by appellant. To me, such a request of the officer seems well within the bounds of reason.").

[91] The government argues that Officer Miranda had reasonable suspicion when he first touched Wetmore to start the frisk because, by that time, Wetmore had stated he had a knife.  See Doc. no. 58, at 10.  This argument is both fatally underdeveloped and, more importantly, inconsistent with the record facts.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

everybody" when he "start[s] to pat," so the question and answer were part of the pat-down here. Thus, even if the court found that the pat-down began when Officer Miranda physically touched Wetmore, it could not consider Wetmore's post-physical-contact knife statement.

In addition, other common indicia of reasonable suspicion were notably missing in this case. For example, Officer Miranda had no prior knowledge of Wetmore, including his criminal history, whether he had gang affiliations, or whether he owned weapons. See United States v. Vargas, 86 F. Supp. 3d 38, 41-42 (D. Mass. 2015) ("Detective Boyle was aware of Defendant's prior arrests for crimes of violence, firearm possession, and drug distribution, including an incident in 2011 or 2012 in which Defendant ran from the police and threw a handgun to the ground which discharged upon impact" and gang affiliation at time of encounter that lead to pat-down). And Wetmore did not exhibit other furtive movements or behaviors that suggested he was trying to hide something from the officer.

Although the situation ultimately never required de-escalation, Officer Miranda successfully prevented it from escalating by engaging Wetmore and St John in the parking lot. At that point, any apparent safety risk that Wetmore posed (which the court finds was minimal) had been diffused. See Johnson, 555 U.S. at 330 ("'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,'" we have stressed, "'if the officers routinely exercise unquestioned command of the situation.'") (quoting Maryland v. Wilson, 519 U.S. 408, 414 (1997)). Additional facts suggesting Wetmore may have been armed or dangerous were required to support reasonable suspicion and thereby justify the frisk. While Officer Miranda did not act unreasonably, the evidence strongly suggests that he searched Wetmore because it was

---

are deemed waived."). Officer Miranda testified that Wetmore stated he had a knife after the officer had already placed his hands on him. The court therefore rejects this argument.

his custom to do so in domestic situations, and he perceived this to be a domestic situation.  But the totality of the evidence – viewed objectively from the perspective of a reasonable officer – suggests that it was not.  And the Fourth Amendment does not allow officers to automatically frisk citizens during police encounters like domestic situations or traffic stops as part of a personal custom or practice, or department-wide policy.[92]  While the suppression of a firearm unlawfully possessed by a convicted felon discovered during a weapons-frisk seems counterintuitive, this particular frisk was not supported by reasonable and articulable suspicion that Wetmore may have been armed and presently dangerous.  It thus violated the Fourth Amendment.  Wetmore's motion to suppress is granted.

## IV.  <u>Conclusion</u>

For the reasons set forth above, Wetmore's motion to suppress[93] is GRANTED and the government's motion for reconsideration[94] is DENIED.

---

[92] Nothing in this ruling or opinion is intended as a criticism of police department policies or police practices that involve pat-downs or frisks as a matter of course in situations that appear to be domestic disputes or domestic violence incidents (although the court found no such situation here).  Such policies and practices may very well be advantageous to both public safety and officer safety.  Such questions are beyond this court's expertise.  The Merrimack Police Department officers that testified in this hearing were not only credible, but also cannot be said to have acted unreasonably from the standpoint of common sense, as opposed to the precise requirements of the Fourth Amendment.  The ruling here is only that there were inadequate grounds to conclude that this was a domestic violence incident, that such domestic violence incidents (when they occur) do not per se justify Terry pat-downs, and that under the facts and circumstances present here, there was insufficient basis to conduct a pat-search for weapons.

[93] Doc. no. 34.

[94] Doc. no. 54.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: May 28, 2021

cc:     Anna Z. Krasinski, AUSA
        Seth R. Aframe, AUSA
        Dorothy E. Graham, Esq.